

160

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    :      CRIMINAL CASE

       Plaintiff(s) **FILED**   Case No.   2:18-cr-00352-HB-3

    v.                JUL 12 2019   Philadelphia, Pennsylvania
                           May 2, 2019

SHARIF EL-BATTOUTY, KATE BARKMAN, Clerk ime 9:37 a.m. to 2:23 p.m.
               By_____ Dep. Clerk

       Defendant(s),    :

. . . . . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL - DAY 5
BEFORE THE HONORABLE HARVEY BARTLE, III
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          Seth Schlessinger
                            U.S. Attorney's Office
                            615 Chestnut Street, Ste. 1250
                            Philadelphia, PA 19106

For the Plaintiff:          Lauren E. Britsch
                            U.S. Department of Justice
                            Criminal Division
                            1400 New York Ave, NW, 6th Floor
                            Washington, DC 20005

For the Plaintiff:          Kaylynn N. Snoop
                            Department of Justice
                            1400 New York Ave, NW
                            Washington, DC 20005

For Defendant Name:         Matthew David Lee
                            Fox Rothschild, LLP
                            2000 Market Street, 20th Floor
                            Philadelphia, PA 19103

Court Recorder/ESR:         Jimmy Cruz
                            Clerk's Office
                            U.S. District Court

Deputy Clerk:               Kristin R. Makely

Transcription Service:        Precise Transcript
                              45 N. Broad Street
                              Ridgewood, NJ 07450

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

3

1                    (Proceedings started at 9:37 a.m.)

2          DEPUTY CLERK KRISTIN MAKELY:  All rise.  Oyez!  Oyez!

3    Oyez!  All men or persons having anything to say before the

4    Honorable Harvey Bartle, III, Judge for the United States

5    District Court in and for the Eastern District of

6    Pennsylvania may at present appear and they shall be heard.

7    God save the United States and this Honorable Court.

8              THE COURT:  Good morning members of the jury, you

9    may be seated.  May I see counsel briefly.

10             THE COURT:  First let me state for the record that

11   Juror No. 2 called in this morning and said that her car had

12   broken down yesterday, and that she has no way of getting

13   from her home in Northampton County to the Lansdale Station,

14   which is about an hour from her home.  I've excused her, and

15   I replaced Alternate No. 1 in her place.  Secondly, I, I told

16   Counsel earlier this morning I've decided to allow the

17   exhibits which have been admitted to go out with the jury,

18   and they would be on a laptop.  Am I correct?

19             MALE SPEAKER:  Yes, sir.

20             THE COURT:  And thirdly, I wanted to mention that I

21   do allow the superseding indictment to go out with the jury.

22   Anything further at this time?

23             MALE SPEAKER:  No, Your Honor.

24             THE COURT:  Ms. Britch, you're going to make the

25   closing -- yes (indiscernible).

1           MS. BRITSCH:  Yes.

2           MR. LEE:  May I just -- may I note my objection --

3           THE COURT:  Absolutely.

4           MR. LEE:  -- to the Government providing the laptop

5    computers to the Jurors?

6           THE COURT:  You may.  Objection overruled.

7           MS. BRITSCH:  Thank you, Judge.

8           THE COURT:  Ms. Britsch, you make closing argument

9    on behalf of the Government.

10          MS. BRITSCH:  Thank you, Your Honor.

11          THE COURT:  You may turn the podium around, if you

12   wish.

13          MS. BRITSCH:  Alright.  Thank you, Your Honor.  I'll

14   leave it here, if that's okay with the Court.

15          THE COURT:  Alright, that's fine.

16          MS. BRITSCH:  Thank you.  How would Mr. Sharif El-

17   Battouty describe himself?  I'm basically awesome.  I can get

18   any girl naked.  L-O-L.  I had them use any objects.  L-O-L.

19   Got tits, bloody pussy, pissing, first day talking to her.

20   His words, not mine.  And, these are just three of the

21   thousands of chats the Defendant posted on the Cam Girls and

22   Thot Counselors servers.  Chats about minor girls, children

23   who are nothing more than playing pieces.  Pawns in the

24   Defendant's little game.  To the Defendant and his buddies on

25   Discord, these girls were like baseball cards, to be

1    collected and traded for their own twisted sexual pleasure.

2    But ladies and gentlemen, this is not a game because these

3    are real children, real girls targeted by the Defendant.

4    Girls, some who hadn't even reached puberty, manipulated,

5    coerced, and directed to engage in sex acts on camera.  The

6    Defendant and his Discord buddies exploited their youth,

7    their, their vulnerability, and they stole their innocence.

8    And, unfortunately the Defendant and his co-conspirators were

9    remarkably successful.  They created thousands of videos

10   depicting child after child after child in their community,

11   achieving wins.  Nearly 150 of these children identified so

12   far.  Think about that number, 150 girls, children, and many

13   more not yet identified by the FBI.  And, the Defendant and

14   his Discord buddies, they shared videos of these real

15   children on the internet, where they will preserved for all

16   time.  The sexual exploitation of these children will never,

17   ever go away.

18        The Defendant is charged with two counts, that both

19   involve joint criminal activity and, as you now know, that

20   joint criminal activity occurred on Discord.  Now, Discord is

21   a regular chatting application that can be used by you or me

22   for a regular, legal purpose.  However, the Defendant and his

23   buddies developed their own little corner of Discord

24   dedicated to their illegal purpose, trading child

25   pornography.  And, that little corner started on Cam Girls,

1   and developed and ended on Thot Counselors.  There, they

2   surrounded themselves with like-minded people who shared

3   their sexual interest in children.  And, they thought they

4   could be safe there.  They thought they could keep out the

5   "normies," normal people.  They caught -- thought that they

6   could elude the FBI and law enforcement.  And, they created

7   and organized and developed a community specifically

8   dedicated to advertising child pornography, and a very

9   particular type of child pornography at that.  Child

10  pornography showing little girls on web camera taking off

11  their clothes, exposing their genitals, masturbating.

12  Children directed to insert objects, plungers, markers,

13  brushes, nail clippers, into their vaginas, all so the

14  Defendant and his buddies could fap, masturbate.  Masturbate

15  to middle-schoolers, some still in elementary school, girls

16  as young as eight years old.  And, this occurred every single

17  day for two years.

18          Now, even by the standards of the group, this group

19  dedicated to child pornography, the Defendant, Fritos, was

20  especially prolific.  He constantly talked about his

21  successes, and sometimes his failures in getting girls to do

22  what he wanted on web camera.  His specialty was getting

23  girls to stick whatever they could find into their vaginas.

24  His strategy was to manipulate the girls by catfishing,

25  pretending to be someone else, to deceive them and coerce

1    them.  And, you saw the Defendant also used a game, a game to

2    manipulate the girls, entice the girls, to engage in

3    progressively more intense, lewd, disgusting sex acts.  And,

4    you saw that the Defendant was proud of his accomplishments.

5    He bragged on Discord about being elite.  Is this really

6    something to be proud of?  Is it a skill for a grown man to

7    dupe a child to insert a plunger into her vagina?  Now, you

8    not only saw the Defendant's words on Discord, but you heard

9    the Defendant's words in a recorded statement to FBI Special

10   Agent Matthew Deragon and, in that statement, he admits to

11   being Fritos.  He admits that Cam Girls and Thot Counselors

12   were dedicated to child pornography, according to him child

13   pornography involving girls as young as 13.  And, he admits

14   that he was active on these servers for about two years.

15   And, you also see this in the Discord IP address records that

16   Verizon connected to the house that the Defendant lived in in

17   New York, Fritos' activity spanning back to 2016 and up until

18   July 2018, when he was arrested.  For two years, the

19   Defendant sat here, in a bedroom, in his parents' house, at

20   this computer, all day targeting children -- two years of

21   producing child pornography, advertising child pornography,

22   trading child pornography.

23          Now, for these crimes, the Defendant is charged with

24   two counts.  Count one is engaging in a child exploitation

25   enterprise, and count two is conspiracy to advertise child

Government - Closing Argument                    8

1    pornography.  I'm going to spend a few minutes talking about

2    how the evidence the Government has presented to you fits

3    into the elements of each of these crimes.  Later, the Judge

4    is going to instruct you on the law and what the Government

5    is required to prove for each of these crimes.  Now, if I say

6    anything different than what the Judge instructs you on the

7    law, you should ignore me and follow the Judge's

8    instructions.  And, the same goes for Defense Counsel.  If he

9    tells you anything different on the law than what the Court

10   instructs you, you should ignore him and follow the Court's

11   instructions.

12          The first charge is engaging in a child exploitation

13   enterprise, and it has three essential elements.  First, that

14   the Defendant distributed, transported, advertised, or

15   received child pornography three separate times, that this

16   involved more than one victim, and that he did it in concert

17   with three or more people.

18          Let's first talk about what it means to distribute,

19   transport, or receive child pornography.  These crimes have

20   similar elements, so I'll talk about them together.  The

21   first element is that the Defendant knowingly transported,

22   distributed, or received an image or video.  The second is

23   that that image or video involved a minor engaging in

24   sexually explicit conduct, and the image or video shows that

25   sexually explicit conduct.  The fourth is -- the third

Government - Closing Argument                    9

1   element is that the Defendant knew it was minor in that image

2   or, or video.  And finally, that the Defendant used a means

3   or facility of interstate commerce to distribute, transport,

4   or receive that video.

5           I'm going to take that last element first, because

6   there's no dispute on the issue of interstate commerce in

7   this case.  First, there's a stipulation, which simply means

8   that the Government and the Defense agree that Discord

9   operated on the internet, and the internet is a means or

10  facility of interstate commerce.  And, you heard testimony

11  from different witnesses, Special Agent Johns, Timothy Friel,

12  that Discord operated on the internet, and that it had users

13  across the country, and also in foreign countries, and it had

14  users, Mr. Timothy Friel, right here in the Eastern District

15  of Pennsylvania.

16          There are also a couple of definitions that apply to

17  these crimes.  First, the law defines a minor as anyone under

18  the age of 18.  Second, the law defines sexually explicit

19  conduct, and that includes actual or simulated masturbation,

20  and you've seen many videos of children masturbating with

21  their hands or inserting objects, plungers, markers, brushes,

22  into their vaginas, masturbation.  And, it also includes

23  lascivious exhibition of the genitals.  Is there really any

24  question that the images and videos traded on Discord were

25  lascivious, that they were lewd, that they were designed to

Government - Closing Argument                    10

1    elicit a sexual response in the viewer, the Defendant and his

2    co-conspirators who fapped and masturbated to these videos.

3    Videos of 8, 10, 11, 12-year-old children?  The videos that

4    have come into evidence are lascivious.

5            Now, as part of the Discord enterprise, the

6    Defendant himself transported, distributed, and received

7    child pornography many, many times, and we've highlighted

8    some examples of those in this case.  Let's start with

9    Fritos' trademark, gif files.  You've heard a lot about these

10   gif files in this case, those short movies, about three

11   seconds, that the Defendant created.  And, the evidence in

12   this case includes 11 different child pornography gifs that

13   the Defendant created and he distributed and transported by

14   uploading them to the Discord servers, uploading them for his

15   fellow users to view and download.  And, he bragged about his

16   gifs.  Here, I think my gif obsession is better than your

17   meme one, with a smiley crying emoji.  And again, Fritos, L-

18   O-L, I had them use any objects.  And, you saw many of those

19   objects in the gifs.  Again, on Thot Counselors, in the

20   Behind The Curtain, that locked channel that Fritos had

21   access to, six more gifs depicting children inserting objects

22   or their hands into their vaginas, masturbating.

23           The Defendant also advertised child pornography on

24   Discord.  As the Judge will instruct you later, both offering

25   child pornography, as well as soliciting or seeking child

1    pornography, counts as advertising child pornography under

2    this law.  And, you saw the Defendant commit this offense by

3    making posts on Discord, posts that request particular videos

4    of particular victims in the undercover screenshots.  Here,

5    in the back, back end Discord records, a request for Alyssa

6    Kentt or Madie, win.  And, the evidence shows what win means

7    in this community.  Win, successfully getting a minor to

8    engage in sexually explicit conduct, masturbation on web

9    camera.  And, this is the Defendant requesting that video.

10   Another time he asks for a person with Alyssa Kentt, win, to

11   PM, private message, him.  And, he also advertises his unseen

12   Acacia.  Again, anyone have Skypes though?  I'll drop -- oh,

13   Ava Skripes, Skypes, a particular victim, and I'll drop Grace

14   and Amaya, offering a trade.  And, you saw on his external

15   hard drive that he had folders dedicated to Alyssa Kentt and

16   Acacia in the subfolder girls I know.  And you saw Acacia, a

17   real minor, exploited by this man.

18        The Defendant also advertised child pornography by

19   offering to make gifs and asking what types of gifs he should

20   make.  And, this is another example of a way he advertised

21   child pornography.  Here, Fritos, who should I make gifs of?

22   And, a fellow user responds, Omegal wins.  And, what does

23   Fritos do in response to that request?  He uploads gifs of

24   his Omegal wins.

25        Lastly, the Defendant also received child

1    pornography.  You heard the Defendant in his recorded

2    interview explain to the on-scene forensic examiner, who is

3    walking through his external hard drive, that the drive

4    included a bunch of downloaded stuff.  And, one of those

5    videos is a video of Lilly and Rayann.  You saw Discord user

6    Choad, post on one of the Discord Cam Girls/Thot Counselors

7    rooms, a LiveMe M3U8 link to that file.  And, this M3U8 link

8    is one of the primary ways that the users of Discord

9    advertise and share child pornography with each other.  And,

10   you heard that this video of Lilly and Rayann was found on

11   the Defendant's external hard drive inside the LiveMe folder.

12   And, you heard Agent Randal from Tex -- Texas tell you that

13   these are real girls.  Rayann, who was only 11 years old, and

14   Lilly, who is only 10.

15          The next element of the first charge, engaging in a

16   child exploitation enterprise, is that the incidents involved

17   more than one victim.  The gifs that you've seen depict at

18   least 11 different minors.  There's also the video of Lilly

19   and Rayann, two more minors.  There are the offers and

20   requests for Amaya, Alyssa Kentt, Acacia, Ava, Madie, Grace,

21   and so many others.  Several more than one minor involved in

22   these crimes.

23          The last element of a child exploitation enterprise

24   is that the Defendant committed these offenses in concert

25   with three or more persons.  Similarly, the first element of

Government - Closing Argument                    13

1   conspiracy to advertise child pornography is that two or more

2   persons agreed to advertise child pornography.  These

3   elements, working in concert with each other, and entering

4   into an agreement, are similar, and so I'm going to talk

5   about some of the evidence that supports both of those

6   elements together.

7           And, as Judge Bartle is going to instruct you, the

8   agreement that is required for a criminal conspiracy doesn't

9   have to be a formal agreement.  It doesn't have to be in

10  writing.  There doesn't even have to be a formal oral

11  agreement.  The members don't have to agree to all the

12  details of how the conspiracy will work or all of the means

13  by which they will accomplish their illegal objective.  It

14  simply has to be a mutual understanding between one or more

15  person, persons, to engage in advertising child pornography.

16  Now, just thinking from a common sense perspective, what was

17  the point of Thot Counselors and Cam Girls if not to work

18  together to advertise and trade child pornography?  That's

19  why these servers existed.  These people could've, and

20  sometimes did, exclusively work on their own, engaging one-

21  on-one with children.  But they went beyond that, they came

22  together.  They joined their efforts on Cam Girls and Thot

23  Counselors so that they could target more children, they

24  could trade material, offer one victim for another, and

25  expand their collective child pornography stashes.

1    And, they were highly organized to achieve that goal.  You

2    saw that they had a hierarchy of membership arranged for

3    certain members to have access to certain channels, and

4    others kept out.  Here you see it on Thot Counselors, Senior

5    Counsel, Junior Counsel, Sophomore Counsel.  You've heard

6    testimony about the different channels that they set up so

7    that they could organize the content based on where it came

8    from, the source, LiveMe channel, Snapchat channel, Periscope

9    channel.  And, this setup of hierarchy of members and

10   channels was designed to discourage lurkers, as you heard

11   them called, and encourage active members who would

12   contribute to the community, add more child pornography,

13   provide more victims.  They had rules and guidelines that

14   they posted about.  They shared tips and tricks.  They had

15   conventions about how to post links so that they could avoid

16   detection by Discord and by law enforcement.  They talked

17   about how you should label your videos as NN, non-nude, so

18   that people would know if it's non-nude, something they might

19   not be interested in.  And here, offering help, tutorials,

20   technical support, so that they can cap and record these

21   girls more efficiently and more effectively.

22        And, you heard evidence that Cam Girls shut down at

23   some point.  Now, when Cam Girls shut down, did this group

24   just disband, scatter off on their own?  No.  You heard

25   evidence that this group, this mutual understanding, this

1  working together, continued server after server, until they

2  ended up on Thot Counselors.  You heard both Special Agent

3  Johns and Timothy Friel testify about this migration from Cam

4  Girls, after it shut down, 'til they ultimately ended up on

5  Thot Counselors.  Thot Counselors was still operating at the

6  time of the Defendant's arrest.

7          Their mutual understanding that these servers were

8  about advertising child pornography was apparent in their

9  actions as well.  You saw multiple examples of members

10  requesting certain videos, certain victims, posting links

11  asking if anyone had more of this girl.  You heard Mr.

12  Timothy Friel explain how he kept that 90-page Word document

13  full of M3U8 links so he could more efficiently and

14  effectively respond to requests from other members and

15  maintain his status in the group.  You've seen them

16  strategizing about techniques to get girls on web camera.

17  This one girl responds better to my girl catfish than my boy,

18  for example.  They discussed ways for recording and capping

19  the live web camera sessions, and complicated methods for

20  posting these M3U8 links so they could avoid detection and

21  not get shut down.  And, they advised each other on how to

22  use JDownloader so they could download many, many child

23  pornography links at one time.

24          Is there really any question that this mutual

25  understanding was about sharing child pornography of underage

1    girls?  The user Dankster summed it up nicely here.

2    Successful 25 plus dudes lusting after 13-year-old girls.

3    This could have been their tag line, pedobear, their mascot.

4    References to panty-less schoolgirls, tweens, 14-year-old,

5    15-year-old.  And, less there be any doubt about their

6    objective to share underage child pornography, just look at

7    the videos shared on Discord.  Girls, some of whom haven't

8    even reached puberty, directed to insert plungers, nail

9    clippers, into their bodies.

10             Now, when the Judge instructs you on the elements of

11   conspiracy, you know what he's not going to tell you?  He's

12   not going to tell you that the Government has to prove that

13   these co-conspirators met in person.  The Judge is not going

14   to tell you that these co-conspirators had to know their real

15   identities.  And, it shouldn't surprise any of us that the

16   Defendant never met his co-conspirators in real life, that

17   they never shared personal information like true names,

18   addresses, and phone numbers.  First of all, they didn't have

19   to.  Cam Girls and Thot Counselors gave them everything they

20   needed to achieve their objection -- objective.  They could

21   communicate with each other in texts about the girls they

22   wanted, they could share links to the child pornography files

23   and links to the live broadcasts where the girls were

24   performing, and they could upload files, gifs, so they could

25   share, transport, and distribute child pornography.  What

Government - Closing Argument                    17

1    would meeting in person have accomplished for them?  Nothing,

2    except to risk exposing their real identities and getting

3    caught by law enforcement.  And, that's what Mr. Timothy

4    Friel explained to you.  Meeting in person would have made no

5    sense in this conspiracy.  It would have undermined this

6    conspiracy rather than furthered it.  They were trading

7    highly illegal content, and they knew it.  It would be simply

8    ridiculous to expect these co-conspirators, whose interest

9    was in trading child pornography on the internet, to meet in

10   person and expose their identities.

11        Now let's talk a little bit about the Defendant's

12   participation in this conspiracy.

13        THE COURT:  Five more minutes, Ms. Britsch.

14        MS. BRITSCH:  Thank you, Your Honor.  There's no

15   question that the Defendant is Fritos, and you saw plenty of

16   activity by Fritos.  And, now Mr. Lee spent some time

17   emphasizing that maybe Fritos wasn't the top dog in this

18   conspiracy, but there's no doubt that he was one of the top

19   dogs.  He was part of the Senior Counsel.  And, one thing

20   you're not going to hear the Judge instruct you is that there

21   is any requirement that the Defendant be a high level member

22   in the conspiracy.  In fact, the Defendant -- the Judge is

23   going to instruct you on quite the opposite.  The Government

24   does not have to prove that about the Defendant.  So, don't

25   let the fact that a user like Orlok may have created the

Government - Closing Argument                    18

1    server distract you from the fact that Fritos was an active

2    and elite member of this server, posting about gifs,

3    uploading those gifs, making requests for re-uploads, asking

4    for win, offering to drop the megaton bomb in response,

5    asking for win in private messages.

6            And, then there's all the evidence on the

7    Defendant's external hard drive, mounds of child pornography

8    of the exact type sought and shared on Cam Girls and Thot

9    Counselors.  Let's also not forget the Defendant talked about

10   catfishing, one of his strategies for getting content from

11   these girls.  CF, catfish.  He also bragged about his sources

12   on Cam Girls.  The sources that he talked about in his

13   interview were those folders on his external hard drive,

14   meufs, my Omegles.  He admitted those are the girls he

15   chatted with one-on-one.  And, you saw exhibit after exhibit

16   of the hundreds of folders and videos the Defendant had.

17   Sources of these particular gifs that he uploaded were

18   located on his hard drive, video of these two girls from

19   which he made a gif.  This gif, as well, the video on his

20   computer.  And, Fritos bragged about his sources on Discord.

21   He hoarded all of his "good shit."  And, you saw that on his

22   external hard drive.

23           He also saved these chat conversations with minors.

24   14 years old -- girl, I was 10, nasty, go to hell.  His

25   response, I thought you were 13.  14 -- 12-year-old, and then

1    finally please stop, I'm only 9.  He told Special Agent
2    Deragon that he saved these chats 'cause he thought they were
3    funny.  Funny?  Really?  Even a 12-year-old knew this was
4    gross.  A 9-year-old knew it was wrong.  And finally, there's
5    the Defendant's game.  Elaborate, detailed slide shows
6    dedicated to getting minors to engage in progressively more
7    and more lewd sex acts.  You saw evidence of how this
8    particular line from a game he talked about on Discord, from
9    the other game, encouraging the children to hump a plush toy.
10   And, you saw a video of this child on his computer directed
11   to hump a teddy bear.  Is it a coincidence that he's talking
12   about children's toys, stuffed animals?  The Defendant had
13   multiple videos that were titled to correspond to these
14   games.  Name and age, and the word game.
15           Fritos worked in concert with his Discord buddies
16   day in and day out for nearly two years.  As Agent Johns
17   testified, their joint criminal activity resulted in the
18   victimization of at least 150 identified minors.  Real
19   children, not virtual pawns.  Victims from across the country
20   who you heard about in this trial.  Aubrey, whose mother told
21   you that she was only 12 years old the time her video was
22   shared on the internet.  Rayann from Texas, Payton from
23   California, both only 11.  And Lilly, who was only 10.
24   To the Defendant, these girls, these real, live children,
25   were playing pieces in his little game.  But, this is not a

Government - Closing Argument/Defendant - Closing Argument
20

1   game.  It is a crime, a horrible, horrible crime, that

2   targeted real children.  The evidence shows that the

3   Defendant, Fritos, is guilty beyond a reasonable doubt.  Find

4   him guilty.

5           THE COURT:  Thank you.  Mr. Lee, you may make a

6   closing on behalf of the Defendant.

7           MR. LEE:  Good morning, ladies and gentlemen of the

8   jury.  I'd like to start by repeating something that I said

9   to you in my opening statement earlier this week, and I want

10  to thank you for serving as Jurors in this case.  I said in

11  my opening that serving as a Juror is one of the most

12  important things that we do as citizens and as members of

13  society, and I am grateful for your service, and so is Mr.

14  El-Battouty.  And I know that serving on a jury can be

15  difficult.  It's a time commitment away from your employer or

16  your family, and it's not an easy thing to do, but I thank

17  you all for your commitment to listening to all of the

18  evidence that was presented in this case.  And in particular,

19  I know that the evidence that you've seen in this case is

20  often -- it was oftentimes disturbing and offensive, and I

21  understand and I recognize that that fact made it especially

22  difficult to serve on this jury, but I thank you for doing

23  so.

24          In my opening statement, I also told you that this

25  was a case about someone who sat in front of a computer day

Defendant - Closing Argument                21

1    after day, night after night and in doing so that person

2    engaged in one-on-one interactions with others, and he read

3    and he posted messages on various Discord server message

4    boards.  But in doing these things, he did so alone.  He

5    acted for and on behalf of himself, and not for others, and

6    not with others.  And, that is fundamentally what this case

7    is about.

8           The Government, for its part, contends that this

9    case is about a global enterprise, a grand conspiracy of

10   like-minded individuals who were engaged in all manner of

11   illegal activity.  But I submit to you that the evidence

12   shows that the Government is incorrect in that regard, and

13   this is a case about a single individual who acted alone.

14   I'd like to start by talking about some of the witnesses who

15   testified in the trial and whose testimony you heard, and I'm

16   going to start with Mr. Timothy Friel.  You will recall that

17   Mr. Friel took the witness stand earlier this week,

18   testified, acknowledged that he is a cooperating witness for

19   the Government, he had pleaded guilty already.  He is

20   awaiting sentencing by this Court, by Judge Bartle, in two

21   weeks, in this very court room.  He will be back in this

22   courtroom in two weeks, standing before Judge Bartle to

23   receive his sentence for the crimes that he has acknowledged

24   he committed.

25          During Mr. Friel's testimony, you heard that he was

Defendant - Closing Argument                    22

1    interviewed earlier -- in February of 2018, by Special Agent
2    Daniel Johns, who's here in the courtroom and who testified
3    not once, but twice in this case.  Mr. Friel was interviewed
4    by Agent Johns and another FBI agent at his home in Bucks
5    County, and I want to talk about first how that interview of
6    Mr. Friel was conducted by those two FBI agents.  You will
7    recall that during my cross-examination, I questioned Mr.
8    Friel.  He acknowledged that when these two FBI agents came
9    to his house and interviewed him as part of the execution of
10   a search warrant, they told him that it was FBI policy to
11   advise him of his rights, and they did, in fact, advise him
12   of his rights.  And, you will recall that they gave him a
13   whole series of -- they read him his rights.  They read him a
14   litany of his rights.  He had the right to remain silent, he
15   was told that anything he could say -- that he did say could
16   be used against him in Court, he had the right to talk to a
17   lawyer before the questioning began, he had the right to have
18   a lawyer present while he was questioned by Agent Johns.  If
19   he couldn't afford a lawyer, the Court would appoint him a
20   lawyer.  And lastly, he was told that if he started answering
21   the Agents' questions but decided to stop, he could do so at
22   any time.  Mr. Friel acknowledged those rights, but yet
23   continued -- agreed to start answering questions that were
24   posed to him by those Agents.  And, you will recall that he
25   lied in response to a direct question by Agent Johns.  He was

Defendant - Closing Argument                    23

1   asked whether he had ever accessed child pornography over the

2   internet, and he said no.  He flat out lied.  He got on the

3   witness stand and acknowledged that.  There is no dispute

4   that he lied.  He, he, he, he, he said so himself.  But was

5   he charged in his case with lying to the FBI, which is a

6   felony?  No, he was not.  Instead, Mr. Friel became a

7   cooperating witness for the FBI, and he agreed to plead

8   guilty, albeit to a much more serious crime.

9       You heard Mr. Friel testify that he's facing an

10  exceedingly long jail sentence for the crimes to which he has

11  committed.  By his own words, he expects to receive a

12  sentence somewhere around 22 years in prison.  I pointed out

13  to him that given a dispute that may -- a dispute on how the

14  sentencing guidelines calculation will work in his case, he

15  could, in fact, be facing a life sentence.  He agreed that

16  that was absolutely correct, and that was absolutely a

17  possibility.

18      So, I ask that you consider very carefully Mr.

19  Friel's motives in testifying in this case.  Remember, the

20  jail sentence that he is facing for the crimes to which he

21  has committed, remember that he is an admitted liar, and

22  remember that in less than two weeks, he will be in this

23  court room standing before Judge Bartle for sentencing.  He

24  is a highly motivated individual.  He is highly motivated to

25  cooperate.  He acknowledged he's highly motivated so that the

Defendant - Closing Argument                          24

1    Government, he's hoping, will file what is known as a 5K

2    motion at his sentencing, and he will receive a lesser

3    sentence.  That is what motivates him.  So, I ask you to keep

4    all of that in mind when considering his testimony in this

5    case.

6           And, it will be up to you, members of the jury, to

7    decide whether you determine that Mr. Friel was, in fact, a

8    credible witness, considering everything that you've heard

9    about him.  I submit to you that he is a liar and that he's

10   not a credible witness.  But, ultimately that is your

11   decision, and I ask that you keep in mind all of the facts

12   and circumstances surrounding Mr. Friel's testimony when you

13   consider his testimony during your deliberations.

14          Next, I'd like to talk about the testimony that you

15   heard from FBI Special Agent Matthew Deragon.  Agent Deragon

16   is from New York.  He testified earlier this week in this

17   court room about what he did on the day of July 18, 2018.

18   You will recall that that was the day that a team of eight

19   armed FBI agents and one New York City police detective went

20   to the El-Battouty residence in Queens, New York, executed a

21   search warrant, they interviewed Mr. El-Battouty.  You heard

22   a lot about that, and I'll get to that in a moment.  Remember

23   also, though, that we talked -- I talked about with Agent

24   Deragon during his testimony the status of the FBI's

25   investigation in this case before he and his team of agents

1   even knocked on the front door of the El-Battouty residence.

2   You will recall that this investigation started way back in

3   May of 2017, when an FBI undercover agent clicked on a link

4   that he found while browsing the internet, and that took him

5   into the Cam Girls server on Discord.  That same FBI

6   undercover agent engaged in monitoring of activity going on

7   at Discord for several months that followed, and he recorded

8   some of that activity.  He specifically recorded activity

9   that was taking place on Discord during that period of time

10  that he was monitoring activity, activity that was being

11  undertaken by the user who is known as Fritos.  The FBI

12  issued a search warrant for user information to Discord in

13  July of 2017, and eventually there were a total of three

14  search warrants that were issued to Discord for user

15  information.

16       You will recall testimony that Discord provided user

17  information in response to the search warrants, which

18  included IP addresses.  The FBI sent subpoenas to various

19  internet service providers to find out the subscriber

20  information that corresponded to those IP addresses,

21  including an IP address that Verizon provided information to

22  indicate that that IP address was associated with a residence

23  in Woodside, New York, which was, in fact, the El-Battouty

24  residence.

25       The FBI also did what was called open source

Defendant - Closing Argument                    26

1    database research.  You'll recall that I questioned Agent

2    Deragon about that.  And the FBI learned that there were

3    three individuals who lived at the El-Battouty residence in

4    Woodside, New York -- the Defendant and his two parents.  His

5    79-year-old father, and his mother, whose name is Anne.

6    And lastly, you will recall that Agent Deragon testified

7    about, about a lead that he received from the FBI in

8    Philadelphia, that it asked the New York Division of the FBI

9    to carry out this investigation search warrant, and Agent

10   Deragon testified that he understood that it was the

11   intention of the FBI to arrest individuals on July 18, 2018,

12   the day that that search warrant was executed at the El-

13   Battouty residence.

14          This is all the information that Agent Deragon and

15   his team of agents had in their heads before they even

16   knocked on the door of the El-Battouty residence.  This

17   investigation had proceeded very far.  Significant amounts of

18   information had been gathered, collected by the FBI, and

19   Agent Deragon knew all that information before he even

20   stepped up the stairs and knocked on the door of the El-

21   Battouty residence.

22          The FBI arrived at the El-Battouty residence on July

23   18th at 6:01 in the morning.  Within six minutes of their

24   arrival at the residence, Agent Deragon and his partner

25   proceeded in the parents' bedroom, across from Mr. El-

1    Battouty, the Defendant, in this case, interrogating him.   It

2    took them six minutes to start interrogating Mr. El-Battouty.

3    They knew exactly who they were going to talk to when they

4    got to that residence.   They knew that it wasn't the 79-year-

5    old father.   They knew that it wasn't the Defendant's mother.

6    They were targeting Mr. El-Battouty, the Defendant in this

7    case, and it's clear from the timeline that they went right

8    to him.   It took them six minutes to focus their attention on

9    Mr. El-Battouty.

10              Now, in the course of interrogating him, it's clear

11   -- I believe it's clear.   I submit to you that the agents

12   misled Mr. El-Battouty about the investigation.   You will

13   recall from the audio recording of the interview that was

14   played in Court that Mr. El-Battouty asked the agents a

15   number of questions about the investigation and about his

16   status.   One minute into the interview, Agent Deragon says to

17   Mr. El-Battouty, "I just want you to know right now that

18   you're not under arrest, okay?   Right now you're not in any

19   trouble."   It's clear, however, from the evidence, that that

20   was not a true statement.   Mr. El-Battouty was in serious

21   trouble, and he was misled by Agent Deragon, who said to him

22   you're not in any trouble.   Twelve minutes into the

23   interview, Mr. El-Battouty says "am I gonna go to jail or

24   something?"   Response from Agent Deragon, "well, I don't know

25   that yet, man."   Twenty-five minutes into the interview, Mr.

Defendant - Closing Argument                    28

1    El-Battouty says am I in trouble?  Just tell me like what's

2    going on.  Answer from Agent Deragon, I don't know.  These

3    agents were clearly encouraging Mr. El-Battouty to talk, to

4    answer their questions, and they were misleading him about

5    how serious -- about, about how much trouble he really was

6    in.

7         The other thing that's abundantly clear from the

8    FBI's interrogation of Mr. El-Battouty is that the agents

9    failed to adequately advise him of his rights.  Recall what I

10   just said a moment ago about Mr. Friel, and recall his

11   testimony.  The FBI agents who went to visit Mr. Friel,

12   including Agent Johns, said it was FBI policy to advise

13   someone in Mr. Friel's position of their rights before the

14   interview started, and he was, in fact, advised of all of his

15   rights.  That did not happen when Agent Deragon and his team

16   of agents went to the El-Battouty residence and started their

17   interrogations of Mr. El-Battouty.  He was told some of his

18   rights, but he certainly wasn't advised that he had the right

19   to consult with a lawyer or he had the right to have a lawyer

20   present while he was answering questions, or that he could

21   stop the questions at any time, if he so chose, chose to do

22   so.  So, it's clear that the FBI policy that Mr. Friel spoke

23   about that was applied to him in his case by Agent Johns

24   evidently didn't apply to Mr. El-Battouty was he was

25   interrogated by agents at his home.

Defendant - Closing Argument                29

1          Now, you heard evidence that Agent Deragon completed
2     his interview of Mr. El-Battouty at 7:25 a.m., less than 90
3     minutes after the agents came into that house, and less than
4     90 minutes after Agent Deragon had told Mr. El-Battouty that
5     he wasn't in trouble.  He was in trouble.  He was in serious
6     trouble and, at the conclusion of that interview, at 7:25
7     a.m., Agent Deragon advised Mr. El-Battouty that he was going
8     to be placed under arrest.
9          Now, Judge Bartle, in a few moments, will give you
10    specific instructions on the law and its -- and specifically
11    how much weight you may choose to give to Mr. El-Battouty's
12    statement to the FBI.  One factor that Judge Bartle will
13    instruct you on and one factor that the Court will instruct
14    you to consider, is whether you think that Mr. El-Battouty's
15    statement to the FBI agents that day was voluntary.  The
16    Court will instruct you that if you determine that Mr. El-
17    Battouty's statement to the FBI was not voluntary, you may --
18    you may, and indeed must, disregard it.  Based upon the
19    evidence that was presented at trial, I submit to you that
20    you should conclude that Mr. El-Battouty's statement to the
21    FBI that day was not voluntary, because Special Agent Deragon
22    gave false assurances not once, not twice, but multiple times
23    to Mr. El-Battouty about how much trouble he really was in.
24    It's clear that Mr. El-Battouty, as I said, was in a great
25    deal of trouble that day, even before that team of eight FBI

1    agents and one New York City police detective descended upon

2    his family home in Queens, New York.   Mr. El-Battouty's

3    statement, under these circumstances, I submit to you, was

4    not voluntary, and you should disregard it.

5            Now I'd like to turn to you -- talk to you about the

6    specific charges in the case.   You heard from the Government

7    during their closing that count one, in this case, charges

8    Mr. El-Baddouty -- El-Battouty with engaging in what the law

9    calls a child exploitation enterprise, and Judge Bartle will

10   give you specific instructions on what the law requires in

11   that regard.   And the Government attorney, during her closing

12   argument, went through the elements.   And I won't repeat

13   those elements, other than to say I want to focus on the

14   third element, which I believe is the most important element

15   for the purposes of this case.

16           The third element is that -- requires the Government

17   to prove beyond a reasonable doubt that the Defendant

18   committed the offenses, the multiple offenses, in concert

19   with three or more other persons.   While we believe -- excuse

20   me, while I submit to you that the Government has failed to

21   meet its burden of proof on the first two elements, I really

22   want to focus on the third.   Now, you heard during the

23   Government's closing that it's the Government's position that

24   Mr. El-Battouty was part of an enterprise that consisted of

25   numerous individuals located throughout the United States,

1    and perhaps even in the world, all acting together, acting in

2    concert, which is the legal term, by using the various

3    Discord servers and text channels.

4          Once you receive instructions from the Court, in a

5    few minutes, it will be your job to determine whether the

6    Government has, in fact, proven beyond a reasonable doubt

7    that Mr. El-Battouty committed these offenses in concert with

8    three or more other persons.  You will have to decide whether

9    Mr. El-Battouty and the other alleged members of what the

10   Government refers to as this enterprise, were essentially in

11   business or partnership together in order to do these illegal

12   things.  And I submit to you, ladies and gentlemen of the

13   jury, that the evidence in this case falls far short of

14   establishing that Mr. El-Battouty act, acted in concert with

15   anyone, let alone three or more other persons.

16         I ask that you consider the following evidence that

17   was presented at the trial in this case.  The evidence is

18   clear that Mr. El-Battouty never met with any of the other

19   individuals who were alleged to have been users on these

20   various Discord servers.  It's undisputed that the Discord

21   users that -- who, who have been referred to during this

22   trial, didn't know each other's real names.  They only know -

23   - knew each other by their online user names.

24   Mr. El-Battouty never knew where any of these individuals

25   lived, or even what they looked like.  They may have lived

Defendant - Closing Argument                    32

1    down the street from him, they may have lived across the

2    country, they may have lived in another part of the world.

3    He did not know.  There's no evidence that's been presented

4    that Mr. El-Battouty spoke to any of them on the phone, and

5    certainly never met any of them face-to-face.  Everything

6    that Mr. El-Battouty has alleged to have done in this case

7    occurred while he was sitting behind the computer screen in

8    his parents' home in Queens, New York.

9          Now, during the course of the trial, you heard

10   testimony about how the Discord servers and the various sub-

11   rooms in each of those servers operate, and you heard

12   evidence about how users can post messages on those servers

13   and can communicate with one another.  But the Government

14   failed to introduce any evidence demonstrating that Discord

15   users on these particular services -- servers, excuse me,

16   coordinated their online activities or their messages.

17   Instead, users could log in at any time, and they could read

18   messages at any time, and they could post messages at any

19   time.  Users could choose not to log on to Discord.  It was

20   entirely up to them.  Users could participate in any number

21   of servers or channels at any one time, or not.

22         The Government did not present any credible evidence

23   suggesting that the Discord -- that Discord users had a

24   common purpose or a common goal, nor did the text channel

25   messages that were introduced into evidence by the Government

Defendant - Closing Argument                33

1    contain any such discussion over a common purpose or a common

2    goal nor, I submit to you, can any common purpose be

3    reasonably inferred from the activities of Discord users on

4    these various servers.

5         Now you heard throughout the course of the trial

6    and, and, again, this morning in the Government's closing,

7    that the user known as Fritos had some sort of a leadership

8    rule, leadership role, with the Discord servers that are at

9    issue in this case.  It is undisputed, however, in this case,

10   that Fritos did not create the Cam Girl server.  He did not

11   create the Thot Counselors server.  He did not create any of

12   the sub-channels or sub-rooms contained with any -- within

13   either one of those servers.

14        And while the Government argues to you that Fritos

15   was apparently designated this Senior Counsel role on Thot

16   Counselors, I submit to you that there was no credible

17   evidence presented that Fritos exercised any actual

18   leadership or administrative role with in the Discord

19   servers.  There was no evidence that Fritos wrote the rules

20   or the guidelines that governed how these servers were to

21   operate.  There's no evidence that Fritos established the

22   naming conventions that the Government spoke about in, in

23   their, in their closing argument a few moments ago, the

24   naming convention for certain files.

25        I ask that you remember that the Government has to

1    prove beyond a reasonable doubt that Mr. El-Battouty

2    committed the offenses in question in concert with three or

3    more other persons, and this is critically important.  The

4    only live witness who testified at trial who could possibly

5    considered one of these three or more other persons was Mr.

6    Friel.  I've already addressed the serious credibility

7    problems that it -- that, that Mr. Friel has, and I'm not

8    going to repeat that again.  You've already heard that.  I've

9    already talked about Mr. Friel's deep-seated motivation in

10   this case to cooperate with the Government against Mr. El-

11   Battouty in order to curry favor with the prosecution and to

12   earn what he is hoping to be -- what he is hoping will be a

13   lesser sentence when he is sentenced in two weeks.  So, I

14   respectfully suggest that you disregard Mr. Friel's

15   testimony, and he cannot be considered one of the three or

16   more other individuals for purposes of the in concert

17   requirement for this element of count one.

18         So, if we take Mr. Friel out of the equation, the

19   Government cannot establish the existence of three or more

20   other persons without utilizing the messages that were posted

21   on the various message boards on the Discord servers, which

22   we saw at trial.  But it's equally clear that each individual

23   on -- each individual user on Discord posted messages

24   whenever that user saw fit to do so at a time and in a manner

25   of his own choosing.

Defendant - Closing Argument                    35

1          The Government pointed out that Discord's users

2     would sometimes ask questions of other users or would respond

3     with gratitude to a previous post.  But I submit to you that

4     answering a question post -- posted on a message board or

5     saying thank you in response to a posting on a message board,

6     is not the same as acting in concert.

7          Agent Johns testified twice in this case, you will

8     recall.  During his second testimony, he testified

9     extensively about forensic analysis that was performed by the

10    FBI on the various computer devices that were seized from the

11    El-Battouty residence -- the desktop computer, the external

12    hard drive.  Agent Johns testified that many of the items

13    that were found on the external hard drive represented what

14    he agreed with me could be characterized fairly as one-on-one

15    interactions.  In other words, he discovered numerous

16    screenshots of Snapchat and other types of text message

17    exchanges, and Agent Johns acknowledged that these

18    interactions took place outside of Discord, entirely separate

19    from the Discord activity that we've been talking about so

20    much in this case.

21         So, I submit to you that you should not consider any

22    of these one-on-one interactions, the evidence of which Agent

23    Johns testified was found on the external hard drive, for

24    purposes of determining whether Mr. El-Battouty is guilty on

25    count one, because by their very nature, these one-on-one

Defendant - Closing Argument                 36

1   interactions could not possibly be considered to be offenses
2   committed in concert with three or more other persons for
3   purposes of count one.
4        The second crime that Mr. El-Battouty is charge with
5   in this case, as you know, is conspiracy to advertise child
6   pornography.  And again, you will hear from Judge Bartle in a
7   few moments about the law as it applies to that particular
8   crime.  You will learn that a conspiracy is when two or more
9   individuals get together and agree to work together to carry
10  out the object of the conspiracy.  So, to have a conspiracy
11  you have to have two or more individuals, and you need, most
12  importantly, an agreement to carry out the object of the
13  conspiracy, to work together toward a common purpose.  And
14  it's equally clear, as you will hear from the Court, that the
15  Government has to prove beyond a reasonable doubt that the
16  participants in the conspiracy knowingly and intentionally
17  agreed to work together toward that common purpose.
18  So, to prove a conspiracy in this case against Mr. El-
19  Battouty, the Government will have to show beyond a
20  reasonable doubt that he knowingly and intentionally agreed
21  to work together with all of these other individuals to
22  achieve a common goal, and that is to advertise child
23  pornography.
24        So, let's start with the requirement that the
25  Government prove the existence of an agreement among co-

1    conspirators.  So, what is the evidence of an agreement in

2    this case?  I submit to you that there is no evidence of an

3    agreement in this case.  Again, the only potential co-

4    conspirator that you heard from, who testified live in this

5    court room, was Mr. Friel.  No other potential co-

6    conspirators testified live, so Mr. Friel is the only one who

7    came into this court room and testified.  I will not repeat

8    what I've already said about Mr. Friel, other than to say his

9    testimony, I submit, should not be considered for purposes of

10   your deliberations into whether there was an agreement.

11   So, setting aside Mr. Friel's testimony, the only other way

12   that the Government can prove an agreement in this case is by

13   relying upon the Discord messages.  But again, I submit to

14   you that those messages contain no evidence of an agreement

15   whatsoever, and certainly not proof of an agreement beyond a

16   reasonable doubt.

17          Ladies and gentlemen of the jury, at the end of the

18   trial, you heard testimony regarding four young women whose

19   videos were posted to one of the Discord servers.   In

20   considering the evidence and the testimony regarding those

21   four individuals, I'd just ask that you keep in mind a few

22   points.  The user who went by the name Fritos did not post

23   the links to those videos that were uploaded to Discord.

24   Agent Johns agreed with me in his testimony that Fritos was

25   not the user that uploaded those links to Discord.  This was

Defendant - Closing Argument                38

1   done by other users on the Discord servers.  The Government

2   didn't present any, any evidence that the user Fritos was

3   responsible for recording the videos of those four young

4   women.  And lastly, the Government presented no evidence that

5   the user Fritos had any type of one-on-one interaction with

6   any of those four young women.

7          Ladies and gentlemen of the jury, in conclusion,

8   this case is ultimately about a single person who was glued

9   to his computer day and night, engaging in one-on-one action

10  -- interactions using applications such as Snapchat and other

11  types of text messaging, and who read and posted messages on

12  a Discord server or servers.  You may ultimately decide that

13  this individual engaged in disgusting and abhorrent behavior.

14  But he did so alone, and he did so for his own purposes and

15  not in concert with, or in any type of a conspiratorial

16  agreement with others.

17         So, inclusion -- in conclusion, I once again I thank

18  you for your service, and I ask that you return a verdict of

19  not guilty on both counts.  Thank you.

20         THE COURT:  Members of the jury, as I told you

21  yesterday, the Government under our rules, is entitled to a

22  short rebuttal.  Ms. Shoop?

23         MS. SHOOP:  Thank you, Your Honor.

24         MS. SHOOP:  Pedos and pervs.  Pedophiles and

25  perverts.  That's what the Defendant and his buddies on

1    Discord call themselves.  You saw that in the messages.  The
2    user DarkU, he was right when he said youngees (ph) are so
3    easy.  Children are easy targets, they're very easy targets.
4    All day, all night, for approximately two years, the
5    Defendant and the other users on Discord, they worked
6    together and they targeted thousands of children.  Think
7    about that number.  Let there be no mistake, ladies and
8    gentlemen, the Defendant sitting in front of you is
9    absolutely guilty of engaging in a child exploitation
10   enterprise.  He's absolutely guilty of engaging in a
11   conspiracy to advertise child pornography.  It doesn't matter
12   that none of these people met in person.  The Judge will tell
13   you actually, the law specifically states that the Government
14   does not have to prove that the members of the conspiracy
15   directly met, that they even know each other in real life, or
16   that all the members of the conspiracy are even known.

17         Let's talk about the agreement that the Defense
18   Counsel talked about.  It doesn't matter that there's not a
19   formal written agreement between the members on Discord.
20   That's what the law says.  It specifically states that the
21   Government does not have to prove the existence of a formal
22   or written agreement, or even an oral one.  And think about
23   that for a moment.  That makes sense, right?  We don't have
24   criminals coming together at a table, sitting down, signing a
25   contract like they're buying a car.  That's not how these

1    operations work.  That's not how this group of people worked.

2    The law also does not require that the Defendant played a

3    substantial role in the conspiracy.  That's what it says.

4    That's what the Judge will instruct you.  But in this case,

5    he did.  He was Senior Counsel.  He was the Epics.  He

6    himself did, in fact, have the power to kick people out, and

7    he admits that in his interview.

8         The law states that you may find the existence of a

9    conspiracy based on the circumstances surrounding the scheme.

10   That word scheme, that's literally in the law.  The Judge

11   will instruct you about that.  That's what a conspiracy is,

12   it's a scheme, a scheme where people participate together.

13   And the circumstances surrounding the scheme in this case are

14   very clear.  The Defendant and the other members on Cam Girls

15   and Thot Counselors, they were a team.  Think about the way

16   they operated.  They moved from server to server together.

17   They did congratulate one another.  They encouraged each

18   other.  They shared different techniques and methods about

19   obtaining the required content.  They created rules, they had

20   a hierarchy.  Only certain members had access to certain

21   stuff.  They shared the file with the child pornography, they

22   shared the links to child pornography.  They were organized.

23        I want to talk to you about this one-on-one that the

24   Defense Counsel mentioned.  Did Mr. El-Battouty really work

25   alone?  Come on, really?  You've watched the undercover

1    recordings.  You've read the chats.  You've heard his own

2    statement.  He didn't work alone, he worked with all of these

3    other users.  In fact, he literally gives a list in his

4    interview.  Oh, I know fap89, I known Harmon, I know DarkU, I

5    know Toot, I know Jizzbomb, I know Orlok, I know Davis (ph),

6    I know Lightsmare (ph), I know Opensbobsburger (ph), I know

7    The Goat.  He literally highlighted all of those users in his

8    interview, that he knew, that he worked with.  There was

9    nothing about this that was one-on-one on Discord.  They all

10   worked together.

11         Now, what I will say is yeah, you know what the one-

12   on-one was, is when he went out and he talked to these kids

13   on his own to produce the child pornography, to do what with

14   it?  Bring it back to the group.  That's how they operated.

15   You can literally see that from the gifs that the Government

16   has presented to you.  The full files of those videos that he

17   produced one-on-one, those are on his computer.  They're on

18   that hard drive.  He did use specialized software to cut a

19   three-second clip, and then upload it to the group.  So, you

20   know what?  The Government will agree, he did engage in one-

21   on-one communications with a minor, but for the benefit and

22   the common goal of the group.

23         Let's talk about Timothy Friel for a second.  The

24   Defense is right.  He sat up there and he told you he has

25   pled guilty.  He's pled guilty to engaging in a child

1   exploitation enterprise on Discord.  Everything that he

2   testified up there about was corroborated by the evidence --

3   how they operated, how they worked, the purpose.  That's the

4   same thing that Agent Johns saw when he was a member of it.

5   Was he lying about being JJchuck, the user?  Well no, because

6   we saw the undercover recordings.  He's like yeah, that's me.

7   Was he lying about the way they operated?  You saw that.  You

8   saw it in the chats.  You saw it in the undercover

9   recordings.  You heard it from Agent Johns.  Is it surprising

10  that when the FBI showed up to his house, that he lied and

11  said I haven't seen child pornography?  Is it surprising that

12  he didn't want to admit to being in this organized scheme,

13  this child exploitation enterprise?  That's not surprising.

14  Everything that he testified to on that stand has been

15  corroborated by other evidence, and you get to consider that

16  when considering his credibility.

17          I'm going to also comment about Agent Deragon.

18  You've heard the interview yourself.  The Defense used this

19  word, interrogation.  Did that sound like an interrogation?

20  Was Agent Deragon yelling at the Defendant?  Did that sound

21  forceful?  Did he seem coercive?  His tone was completely

22  conversational.  They had the chat in his parents' bedroom,

23  where they had the door open just so that he would feel more

24  comfortable.  And, in fact, if you go back and listen to that

25  interview, the Defendant says, when they talk about the

Government - Rebuttal Argument                    43

1   digital devices, I can show you.  He volunteers to walk over

2   with the FBI agent to the digital devices to show him all the

3   child pornography.  There was nothing coercive about that.

4   Now, ladies and gentlemen, I want to leave you with this.

5   Government Exhibit 19A, that's this right here, this little

6   tiny hard drive.  This tiny little device contains thousands

7   of children that were manipulated by the Defendant to get

8   naked on a web camera, to stick foreign objects in their

9   bodies, for what?  For his sexual gratification.  There are

10  so many files, which you saw when Agent Johns was testifying,

11  on that hard drive, it's almost hard to actually comprehend

12  how this man and his co-conspirators even engaged with that

13  many real children over two years.  But he did.  But they

14  did.

15              THE COURT:  Two more minutes, Ms. Shoop.

16              MS. SHOOP:  Thank you, Your Honor.  As Ms. Britsch

17  told you, the children in this case are real.  You saw a mom

18  testify on the stand yesterday.  She has a real daughter.

19  They have homes.  They go to school.  They have moms and

20  dads.  They're real.  As you deliberate in this case, as you

21  go back and you talk about the evidence and you review the

22  evidence, think about the victims.  The Defendant in this

23  case, he's guilty.  He was a member of the group, he was an

24  active participant, and we ask that you find him guilty of a

25  child exploitation enterprise and for being part of these

1    groups that advertise child pornography.

2         THE COURT:  Members of the jury, we will now take

3    our morning recess of 15 minutes.  The case has not yet been

4    submitted for deliberation.  Please do not discuss it at the

5    recess.  When we return, I will give you your instructions.

6         COURTY REPORTER/ESP JIMMY CRUZ:  All rise.

7         (Recess 10:53 a.m., until 11:42 a.m.)

8         MS. MAKELY:  All rise.  Court is now in session.

9         THE COURT:  You may be seated.  I want to apologize

10   to you, members of the jury.  I had an emergency matter that

11   I had to deal with, so that's why there was a delay.  Thank

12   you for your patience.  Members of the jury, we have now

13   arrived at the point in the case where I charge you before

14   you go out to deliberate.  That is to say, this is the point

15   when I tell you what the law is.  You must apply that law to

16   the facts that you find from the evidence before you.  You

17   are not single out any one instruction of mine as stating the

18   law.  Rather, you should consider as a whole all the

19   instructions that I give you.  On the other hand, as I have

20   told you, the determination of the facts, the determination

21   of questions of fact, and the rendering of a verdict, are all

22   matters solely within your province.  Therefore, I want to

23   emphasize what I said at the outset.  Nothing I have said or

24   done during the course of this trial or will say during the

25   course of this charge was meant by me or should be taken by

1    you as some sort of a hint from me as to what your verdict
2    should be.  The verdict is your function alone, and not mine.
3    It is your duty to base your verdict solely upon the evidence
4    in the case without prejudice again or sympathy for either
5    the Government or the Defendant.  Both parties accept --
6    expect that you will carefully and impartially consider all
7    the evidence in the case, follow the law as stated by The
8    Court, and reach a just verdict, regardless of the
9    consequences.  That was the promise you made and the oath you
10   took before being accepted by the parties as jurors in this
11   case.  They have the right, as do I, to expect nothing less
12   from you.

13        You will recall that I earlier told you that what a
14   lawyer says to you is not evidence.  The only exception to
15   this rule are stipulations or agreements of the parties.  The
16   parties may agree to stipulate to one or more facts, in which
17   case you may accept the fact or facts as evidence.  You are
18   not required to do so, however, since you are the sole judges
19   of the facts.  The lawyers' opening speeches to you, the
20   questions that they asked during the trial, their objections,
21   their arguments and comments to me, and last of all, what
22   they have just said to you in their closing summations, none
23   of that is evidence.  The function of the lawyers is to point
24   out those things that are most significant and most helpful
25   to the lawyers' client and, in so doing, to call your

1    attention to certain facts or inferences that might otherwise

2    escape your notice.  However, it is your recollection and

3    interpretation of the evidence that controls in the case.

4    What the lawyers say is not binding upon you.  Further, any

5    questions that I may have asked are not evidence which you

6    may consider.  Anything you may have seen or heard outside

7    the courtroom is not evidence, neither is the superseding

8    indictment evidence.  It is merely an accusation or charge,

9    and it is not proof of anything or evidence of any kind

10   against the Defendant.

11        The evidence you are to consider in rendering the

12   verdict in this case is the testimony of witnesses regardless

13   of who may have called them, and the documents or other

14   exhibits that have been admitted into evidence, regardless of

15   who may have produced them.  The Government and the Defendant

16   have agreed to certain stipulated facts.  You may therefore

17   treat these facts as having been proven.  You are not

18   required to do so, however, since you are the sole judges of

19   the facts.

20        I have taken what is called judicial notice of the

21   fact that Bucks County is in this judicial district -- that

22   is, in the Eastern District of Pennsylvania.  You may accept

23   this fact as proven, but you are not required to do so.  As

24   with any fact, the final decision of whether to accept it is

25   for you to make, and you are not required to agree with me.

1    In reviewing the evidence, it should not be considered by you

2    in fragmentary parts as though each fact or circumstance

3    stood apart from the others.  You should consider the entire

4    evidence and determine its weight from the whole body of that

5    evidence.  If evidence came in and objection was sustained,

6    or if I instructed you to disregard it, you must put it out

7    of your mind as if you had never heard it.  You are

8    absolutely bound to do that.

9         The Defendant, Sharif El-Battouty, pleaded not

10    guilty to the offenses charged.  He is presumed to be

11    innocent.  The Defendant starts the trial with a clean slate,

12    with no evidence against him.  The presumption of innocence

13    stays with the Defendant unless and until the Government has

14    presented evidence that overcomes that presumption by

15    convincing you that the Defendant is guilty of the offenses

16    charged beyond a reasonable doubt.  The presumption of

17    innocence requires that you find the Defendant Not Guilty on

18    a charge unless you are satisfied that the Government has

19    proven guilt beyond a reasonable doubt on that charge.  The

20    presumption of innocence means that the Defendant has no

21    burden or obligation to present any evidence at all or to

22    prove that he is not guilty.  The burden or obligation of

23    proof is on the Government to prove that the Defendant is

24    guilty, and this burden stays with the Government throughout

25    the trial.  The burden is always upon the Government to prove

1    guilt beyond a reasonable doubt.  The law does not impose any
2    burden on a Defendant and does not require a Defendant to
3    prove his or her innocence or to produce any evidence at all.
4    The Government has the heavy burden of proving a Defendant
5    guilty beyond a reasonable doubt and, if it fails to do so,
6    you must acquit the Defendant.  The Government must establish
7    each of the elements of the offense with which a Defendant is
8    charged by proof beyond a reasonable doubt.  Thus, for
9    example, if a crime has three elements and the Government
10   proves only two of them beyond a reasonable doubt, you must
11   acquit on that charge.  Similarly, some elements of the
12   charged offenses may be proved in one or more different ways.
13   Under that circumstance, you may not convict the Defendant
14   unless you unanimously agree that the Government has met its
15   burden of proof on at least one of the alternatives or
16   options.

17        The requirement that the Government prove its case
18   beyond a reasonable doubt, however, does not mean that it
19   must prove guilt beyond all possible doubt.  The test is one
20   of reasonable doubt.  Reasonable doubt is a doubt based upon
21   reason and common sense.  After careful and impartial
22   consideration of all the evidence in the case, the kind of
23   doubt that would make a reasonable person hesitate to act.
24   Proof beyond a reasonable doubt, therefore, is proof of such
25   a convincing character that you would be willing to rely and

49

1    upon it without hesitation in the most important of your own
2    affairs.  Reasonable doubt is doubt which appeals to your
3    reason, to your judgment, to your common sense, and to your
4    experience.  It is not caprice or whim or speculation.  It is
5    not an excuse to avoid the performance of an unpleasant duty.
6    A Defendant may not be convinced (sic) based on suspicion or
7    conjecture, but only on evidence proving guilt beyond a
8    reasonable doubt.
9         As I discussed with you earlier, there are two types
10   of evidence which you may properly consider.  One is what we
11   call direct evidence.  This is testimony by an eyewitness,
12   someone who saw or heard something.  Thus, as I explained
13   earlier, if someone looked outside and saw that it was
14   snowing, that person could testify that she saw it snowing at
15   a particular time and place, and her testimony would be
16   direct evidence of the fact that it had snowed.  The other
17   type of evidence is called circumstantial evidence.  That is,
18   proof of a chain of circumstances pointing to a conclusion
19   about another fact.  Thus, if the same person went to sleep
20   at night and there was no snow on the ground, but when she
21   awoke the ground was covered with fresh snow, she could
22   testify to those circumstances, and you could infer from this
23   circumstantial evidence the fact that it had snowed during
24   the night, even though she never saw a flake of snow fall.
25   As a general rule, the law makes no distinction between

1    direct and circumstantial evidence.  It simply requires that

2    before convicting a Defendant on any count, you, the jury,

3    must be satisfied of the Defendant's guilt on that count

4    beyond a reasonable doubt from all the evidence, whether

5    direct or circumstantial.

6         In reaching your verdict, you are expected to use

7    your good sense and consider the evidence for only those

8    purposes for which it has been admitted.  Further, you are

9    expected to give the evidence reasonable and fair

10   construction in light of your common knowledge of the natural

11   tendencies and inclinations of human beings.  In other words,

12   you may make deductions and reach conclusions that reason and

13   common sense lead you to draw from the facts which you

14   conclude have been established by the evidence.

15        In your consideration of the evidence, you are not

16   limited to the bald statements of the witnesses.  You are

17   permitted to draw inferences, but only from facts which you

18   have found to be proven from the evidence, and only such

19   inferences as seem justified in light of your experience.

20   The inferences that you can draw, however, are only

21   inferences reasonably and fairly based upon the evidence.

22   In rendering a verdict, you must consider the credibility of

23   witnesses.  Credibility is just another word for

24   believability, and you, the jurors, are the sole judges of

25   the believability of all the witnesses, as well as the sole

1    judges of the weight their testimony deserves.  You should

2    carefully scrutinize all the testimony each witness has given

3    and every matter of evidence which tends to show whether a

4    witness is worthy of belief.  You should decide whether you

5    believe what each witness had to say, and how important that

6    testimony was.  In making your assessment, you should

7    carefully scrutinize all the testimony given, the

8    circumstances under which each witness has testified, and

9    every matter in evidence which tends to show whether a

10   witness, in your determination, is worthy of belief.

11   Consider each witness's intelligence, motive to falsify, and

12   state of mind.  Consider his or her demeanor while on the

13   stand.  Ask yourself a few questions.  Did the person impress

14   you as honest?  Did the witness have any particular reason

15   not to tell the truth?  Did the witness have a personal

16   interest in the outcome of the case?  Did the witness have

17   any relationship with either the Government or the Defense?

18   Did the witness seem to have a good memory?  Did the witness

19   have the ability to observe the matters as to which he or she

20   has testified?  Did the witness have the opportunity and

21   ability to understand the questions and clearly, clearly, and

22   answer them directly?  Did the witness's testimony differ

23   from the testimony of other witnesses?  Did the witness

24   demonstrate any bias, prejudice, or hostility?  These are a

25   few of the considerations that will help you determine the

1   accuracy of what each witness said.  After making your

2   assessment concerning the credibility of a witness, you may

3   decide to believe all of that witness's testimony, only a

4   portion of it, or none of it.

5          Members of the jury, you are not required to accept

6   testimony even though the testimony is uncontradicted and the

7   witness is not impeached.  You may decide, because of the

8   witness's bearing and demeanor, or because of the inherent

9   improbability of his or her testimony, or any part thereof,

10  or for other reasons sufficient to you, that such testimony

11  is not worthy of belief in whole or in part.  And should you

12  find that any witness has testified falsely, then you may

13  either disregard entirely the testimony of that witness, or

14  accept some part of it and reject the other part of it,

15  whether or not it is contradicted.

16         In this case, you have heard as witnesses certain

17  persons who are law enforcement officers; in this case,

18  agents from the Federal Bureau of Investigation I instruct

19  you that these persons are here only as witnesses.  You

20  should judge their credibility as you would any other

21  witness.  You should not give their testimony any great,

22  greater, or lesser weight, or judge them more or less

23  credible just because they are employees or officers of the

24  Government.  At the same time, it is quite legitimate for

25  Defense Counsel to try to attack the believability of a law

1   enforcement officer on the ground that his or her testimony

2   may be colored by a personal or professional interest in the

3   outcome of the case.  You must decide, after reviewing the

4   evidence, whether you believe the testimony of the law

5   enforcement witnesses, and how much weight, if any, it

6   deserves.

7        You have heard evidence that Timothy Friel entered

8   into a Plea Agreement with the Government.  His testimony was

9   received into evidence, and may be considered by you.  But

10  you should consider his testimony with great care and

11  caution.  In evaluating his testimony, you should consider

12  this factor, along with the others I have called to your

13  attention.  Whether or not his testimony may have been

14  influenced by the Plea Agreement is for you to determine.

15  You may give his testimony such weight as you think it

16  deserves.  You must not consider his guilty plea as any

17  evidence of Defendant's guilt.  Mr. Friel's decision to plead

18  guilty was a personal decision about his own guilt.  Such

19  evidence is offered only to allow you to assess the

20  credibility of the witness, to eliminate any concern that the

21  Defendant has been singled out for prosecution, and to

22  explain how the witness came to possess detailed firsthand

23  knowledge of the events about which he has testified.  You

24  may consider his guilty plea only for these purposes.

25  You have also heard that before the trial, one witness made

1  statements that may be different from his testimony in this

2  trial.  It is for you to determine whether these statements

3  were made, and whether they were different from the witness's

4  testimony in this trial.  These earlier statements were

5  brought to your attention only to help you decide whether to

6  believe the witness's testimony here at trial.  You cannot

7  use the earlier statements as proof of the truth of what the

8  witness said in those earlier statements that was not made

9  under oath.  You can only use them as one way of evaluating

10  the witness's testimony in this trial.

11      The Defendant did not testify in this case.  A

12  witness -- rather, a Defendant has an absolute constitutional

13  right not to testify.  The burden of proof remains with the

14  Government throughout the entire trial, and never shifts to

15  the Defendant.  A Defendant is never required to prove that

16  he is innocent.  You must not attach any significance to the

17  fact that the Defendant did not testify.  You must not draw

18  any adverse inference against him because he did not take the

19  witness stand.  Do not consider, for any reason at all, the

20  fact that the Defendant did not testify.  Do not discuss that

21  fact during your deliberations or let it influence your

22  decision in any way.

23      The Government introduced evidence that the

24  Defendant made a statement to law enforcement.  You must

25  decide whether the Defendant did, in fact, make the

1    statement.  If you find that the Defendant did make the

2    statement, then you must decide what weight, if any, you feel

3    the statement deserves.  In making that decision, you should

4    consider all matters into evidence having to do with the

5    statement, including those concerning the Defendant himself

6    and the circumstances under which the statement was made.

7    If, after considering the evidence you determine that a

8    statement was made voluntarily, you may give it such weight

9    as you feel it deserves under the circumstances.  On the

10   other hand, if you determine that the statement was not made

11   voluntarily, you must disregard it.  In determining whether

12   any alleged statement was made voluntarily, you should

13   consider the Defendant's age, training, education,

14   occupation, and physical and mental condition, and his

15   treatment while in custody or under interrogation, as shown

16   by the evidence in the case.  Also consider all the other

17   circumstances into evidence surrounding the making of the

18   alleged statement.

19        Although the Government is required to prove that

20   the Defendant is guilty beyond a reasonable doubt, the

21   Government is not required to call all witnesses as witnesses

22   all persons who may have been present at any time or place

23   involved in the case, or who may appear to have some

24   knowledge of the matters in issue at this trial.

25   Furthermore, the Government is not required to present all

1    possible evidence related to the case.

2         The punishment provided by law for the offenses

3    charged in the superseding indictment is a matter exclusively

4    within the province of The Court should there be a verdict of

5    guilty on any count.  Punishment should never be considered

6    by you, the jury, in any way in arriving at an impartial

7    verdict as to the offenses charged.  You will note that the

8    superseding indictment charges that the offenses were

9    committed on or about certain dates or in and about certain

10   periods of time.  The Government does not have to prove with

11   certainty the exact date of the alleged offenses.  It is

12   sufficient if the Government proves beyond a reasonable doubt

13   that the offenses were committed on a date reasonably near

14   the dates alleged.

15        The superseding indictment alleges that some act in

16   furtherance of the offenses charged occurred in the Eastern

17   District of Pennsylvania.  There is no requirement that all

18   aspects of each offense charged take place here, in the

19   Eastern District of Pennsylvania.  The Government also does

20   not need to prove that the Defendant himself personally

21   committed any acts within the Eastern District of

22   Pennsylvania.  But for you to return a guilty verdict on a

23   crime charged in the superseding indictment, the Government

24   must prove that some act in furtherance of that crime

25   committed by any participant in the offense, whether or not

1    that participant was the Defendant, took place here, in the
2    Eastern District of Pennsylvania.   The Government must prove
3    all the elements of each of the two crimes charged beyond a
4    reasonable doubt, but unlike all the elements of the crimes
5    charged, the fact that some act in furtherance of a crime
6    charged took place in this judicial district only has to be
7    proven by a preponderance of the evidence.   This means the
8    Government only has to prove that its existence is more
9    likely than not.

10         The Defendant is charged with two offenses.   Each
11   offense is charged in a separate count of the superseding
12   indictment.   The number of offenses charged is not evidence
13   of guilt, and this should not influence your decision in any
14   way.   You must separately consider the evidence against the
15   Defendant on each offense charged, and you must return a
16   separate verdict on each offense.   For each offense charged,
17   you must decide whether the Government has proven beyond a
18   reasonable doubt that the Defendant is guilty of that
19   particular offense.   Your decision on one offense, whether
20   guilty or not guilty, should not influence your decision on
21   the other offense.

22         Before the Defendant may be found guilty of either
23   crime charged in the superseding indictment, the Government
24   must establish beyond a reasonable doubt that he acted in a
25   manner forbidden by the law as charged in the superseding

1    indictment, and that he acted with the requisite state of

2    mind.

3         I will now explain to you the offenses with which

4    the Defendant is charged and the law which you must apply in

5    this case.  You are to determine whether the Defendant is

6    guilty or not guilty only as to the specific charges brought

7    against him by the Government.  Such charges are the only

8    charges before you to consider.  The Defendant is not on

9    trial for any conduct which is not charged as a crime in the

10   superseding indictment.

11        As I explained at the beginning of the trial, a

12   superseding indictment is just a formal way of specifying the

13   exact crime the Defendant is accused of committing.  A

14   superseding indictment is simply the description of the

15   charges against the Defendant.  It is an accusation only.  It

16   is not evidence of anything and should not be given any

17   weight -- and you should not give any weight to the fact that

18   the Defendant has been indicted in making your decision in

19   this case.

20        The superseding indictment charges the Defendant

21   with two crimes.  One, engaging in a child exploitation

22   enterprise; and two, conspiracy to advertise child

23   pornography.  The offenses charged in the superseding

24   indictment require proof of the Defendant's state of mind at

25   the time of the commission of the alleged offense.  That is,

1   the Government must prove that the Defendant intended to

2   commit each of the offenses in issue.  Often the state of

3   mind with which a Defendant acts at any given time cannot be

4   proven directly because one cannot read another person's mind

5   and tell what that person is thinking.  However, the

6   Defendant's state of mind can be proven indirectly from the

7   surrounding circumstances.  Thus, to determine the

8   Defendant's state of mind at a particular time, you may

9   consider evidence about what he said, what he did or failed

10  to do, how he acted, and all the other facts and

11  circumstances shown by the evidence that may prove what was

12  in the Defendant's mind at that time.  It is entirely up to

13  you to decide what the evidence presented during this trial

14  proves or fails to prove about the Defendant's state of mind.

15  You may also consider the natural and probable results or

16  consequences of any acts the Defendant knowingly did and

17  whether it is reasonable to conclude that he intended those

18  results or consequences.  You may find, but you are not

19  required to find, that the Defendant knew and intended the

20  natural and probable consequences or results of the acts he

21  knowingly did.  This means that if you find that an ordinary

22  person in the Defendant's situation would have naturally

23  realized that certain consequences would result from his

24  actions, then you may find, but you are not required to find,

25  that the Defendant did know and did intend those consequences

1   would result from his actions.  This is entirely up to you to

2   decide as the finders of facts in this case.

3   The offenses charged in the superseding indictment require

4   the Government to prove that the Defendant acted knowingly

5   with respect to certain elements of the offenses.  This means

6   that the Government must prove beyond a reasonable doubt that

7   the Defendant was conscious and aware of the nature of his

8   actions and of the surrounding facts and circumstances as

9   specified in the definitions of the offenses charged.

10  In deciding whether the Defendant acted knowingly, you may

11  consider in evidence about what the Defendant said, what the

12  Defendant did and failed to do, how the Defendant acted, and

13  all the other facts and circumstances shown by the evidence

14  that may prove what was in Defendant's mind at the time.  The

15  Government, however, is not required to prove that the

16  Defendant knew his acts were against the law.

17  In contrast, motive is not an element of the offense with

18  which the Defendant is charged.  Proof of bad motive is not

19  required to convict.  Further, proof of bad motive alone does

20  not establish that the Defendant is guilty, and proof of good

21  motive alone does not establish that the Defendant is not

22  guilty.  Evidence of the Defendant's motive, however, may

23  help you find the Defendant's intent.  Intent and motive are

24  different concepts.  Motive is what prompts a person to act.

25  Intent refers only to the state of mind with which the

1    particular act is done.  Personal advancement and financial

2    gain, for example, are motives for much of human conduct.

3    However, these motives may prompt one person intentionally to

4    do something perfectly acceptable, while prompting another

5    person intentionally to do an act that is a crime.

6         I now instruct you on the specific elements that the

7    Government must prove for the offense charged in count one of

8    the superseding indictment.  This count charges that from in

9    or about July 2016 through on or before August 29, 2018, the

10   Defendant knowingly engaged in a child exploitation

11   enterprise.  In order for you to find the Defendant guilty of

12   engaging in a child exploitation enterprise, you must find

13   that the Government has proven each of the following three

14   elements.  One, that the Defendant committed a series of

15   felony violations constituting three or more separate

16   incidents.  Two, that the three or more incidents together

17   involved more than one victim in total.  And three, that the

18   Defendant committed these offenses in concert with three or

19   more other persons.

20        I will explain the first element in more detail.  I

21   will also further define the alleged felony violations which

22   the Government must prove in order to establish the existence

23   of child -- a child exploitation enterprise and the

24   Defendant's participation in it.  As I mentioned, the first

25   element of the crime of engaging in a child exploitation

1    enterprise is the Defendant's commission of a series of

2    felony violations constituting three or more separate

3    incidents.  I will now define for you the various types of

4    felony violations which are required to establish a child

5    exploitation enterprise.  The felony violations must be one

6    or more of the following.  Advertising child pornography is

7    one of the relevant types of felony violations.  The elements

8    of that offense are one, that the Defendant knowingly made,

9    printed, or published, or caused to be made, printed, or

10   published, a notice or advertisement.  Two, that the notice

11   or advertisement sought or offered to receive, exchange,

12   produce, display, distribute, or reproduce a visual

13   depiction.  Three, that the visual depiction involved the use

14   of a minor engaged in sexually explicit conduct.  Four, that

15   the visual depiction was of such conduct.  And five, that the

16   Defendant knew or had reason to know that such notice or

17   advertisement would be transported using a means or facility

18   of interstate commerce, or in or affecting interstate

19   commerce by any means, including by computer, or that such

20   notice or advertisement was transported using any means or

21   facility of interstate commerce, or in or affecting

22   interstate commerce by any means, including by computer.

23   Transporting child pornography is another relevant type of

24   felony violation.  The elements of that offense are one, that

25   the Defendant knowingly transported or shipped a visual

1    depiction using any means or facility of interstate commerce,

2    or in or affecting interstate commerce by any means,

3    including by computer.  Two, that the production of the

4    visual depiction involved the use of a minor engaging in

5    sexually explicit conduct.  Three, that the visual depiction

6    was of such conduct.  And four, that the Defendant knew that

7    the production of the depiction involved the use of a minor

8    engaged in sexually explicit conduct and that the depiction

9    was of such conduct.

10         Distributing child pornography is the third relevant

11   type of felony violation.  The elements of that offense are

12   one, that the Defendant knowingly distributed a visual

13   depiction.  Two, that the depiction was distributed using any

14   means or facility of interstate commerce, or that the

15   depiction had been shipped or transported in or affecting

16   interstate commerce by any means, including by computer.

17   Three, that the production of the visual depiction involved

18   the use of a minor engaging in sexually explicit conduct.

19   Four, that the depiction is of the minor engaging in sexually

20   explicit conduct.  And five, that the Defendant knew that the

21   production of the depiction involved the use of a minor

22   engaged in sexually explicit conduct and that the depiction

23   was of such conduct.

24         Receiving child pornography is a fourth relevant

25   type of felony violation.  The elements of that offense are

64

1   that the Defendant knowingly received a visual depiction;

2   that the depiction was received using any means or facility

3   of interstate commerce, or that the depiction had been

4   shipped or transported in or affecting interstate commerce by

5   any means, including by computer; that the production of the

6   visual depiction involved the use of a minor engaging in

7   sexually explicit conduct; that the depiction is of the minor

8   engaging in sexually explicit conduct; and that the Defendant

9   knew that the production of the depiction involved the use of

10  a minor engaged in sexually explicit conduct and that the

11  depiction was of such conduct.

12          In order for you to find that the first element of

13  count one has been satisfied, you must unanimously agree as

14  to which felony violations, as described above, Defendant

15  committed, and that the felony violations constituted three

16  or more separate incidents.  You must be unanimous as to the

17  violations and the three or more incidents.

18          To find the Defendant guilty of engaging in a child

19  exploitation enterprise, you must also find that the

20  Defendant committed the three or more incidents of felony

21  violations in concert with three or more other persons.  It

22  is not necessary that each individual incident was committed

23  in concert with three or more other persons.  The required

24  total of three other persons may be tallied by considering

25  all the incidents together.

1    I will now further define for you the terms minor,

2    visual depiction, sexually explicit conduct, and facility of

3    interstate commerce.  As used in these instructions, minor

4    means any person under the age of 18 years at the time of the

5    offense.  Visual depiction includes data stored on a computer

6    disc or by electronic means which is capable of conversion

7    into a visual image, and data which is capable of conversion

8    into a visual image that has been transported -- transmitted

9    by any means, whether or not stored in a permanent format.

10   Sexually explicit conduct means actual or simulated

11   masturbation; lascivious exhibition of the genitals or pubic

12   area of any person; sexual intercourse, including genital,

13   oral genital, anal genital, or oral anal; bestiality, or

14   sadistic or masochistic abuse.

15   The word lascivious means tend to excite lust, lewd,

16   indecent, obscene, sexually -- sexual impurity, tending to

17   deprive the morals and respect of sexual relations,

18   licentious.  In determining whether a depiction -- visual

19   depiction is lascivious, you may consider the following

20   factors:  Where the focal point of the picture is the child's

21   genitals or pubic area; where the setting is sexually

22   suggestive as, for example, in a place or pose generally

23   associated with sexual activity; where the child is depicted

24   in an unnatural pose considering the age of the child; where

25   the child is partially clothed or nude; where the picture

1    suggests sexual coyness or willingness to engage in sexual
2    activity; where the picture is intended or designed to elicit
3    a sexual response in a viewer; where the picture portrays the
4    child as a sexual object; and the caption, if any, on the
5    picture.  Of course, a visual depiction need not involve all
6    of these factors to be a lascivious exhibition.  The weight
7    or lack of weight which you give to any of these factors is
8    for you to decide.

9         A facility of interstate commerce includes any
10   thing, tool, or device that is involved in interstate
11   commerce.  The internet is a facility of interstate commerce,
12   and the transmission of a visual depiction by means of the
13   internet constitutes transportation of the visual depiction
14   in interstate commerce.  That is, movement between different
15   states in the United States.

16        The Defendant is also charged, in count two of the
17   superseding indictment, with conspiracy to advertise child
18   pornography.  It is a federal crime for two or more persons
19   to agree or conspire to advertise child pornography, even if
20   they never actually chieve -- achieve their objective.  A
21   conspiracy is a kind of criminal partnership.  In order for
22   you to find the Defendant guilty of conspiracy to advertise
23   child pornography, you must find that the Government has
24   proven beyond a reasonable doubt that -- each of the
25   following three elements.  One, that two or more persons

1   agreed to advertise child pornography.  Two, that the

2   Defendant was a party to or member of that agreement.  And

3   three, that the Defendant joined the agreement or conspiracy

4   knowing of its objective and intending to join with at least

5   one other alleged conspirator to achieve that objective; that

6   is, that the Defendant and at least one other alleged

7   conspirator shared a unity of purpose and intent to achieve a

8   common goal or objective to advertise child pornography.

9   I will explain each of these elements in more detail.  I've

10  already explained to you the elements of the offense that is

11  alleged to be the objective of the conspiracy; that is, the

12  offense of advertisement of child pornography in paragraph --

13  in an earlier paragraph.  The first element of the crime of

14  conspiracy is the existence of an agreement.  The Government

15  must prove beyond a reasonable doubt that two or more persons

16  knowingly and intentionally arrived at a mutual understanding

17  or agreement, either spoken or unspoken, to work together to

18  achieve the overall objective of the conspiracy, to commit

19  the offense of advertisement of child pornography.

20  The Government does not have to prove the existence of a

21  formal or written agreement, or an express oral agreement

22  spelling out the details of the understanding.  The

23  Government also does not have to prove that all members of

24  the conspiracy directly met or discussed between themselves

25  their unlawful objective, or agreed to all the details, or

1   agreed to what the means were by which the objective would be

2   accomplished.   The Government is not even required to prove

3   that all the people named in the superseding indictment were,

4   in fact, parties to the agreement, or that all members of the

5   alleged conspiracy were named, or that all members of the

6   conspiracy are even known.   What the government must prove

7   beyond a reasonable doubt is that two or more persons, in

8   some way or matter, arrived at some type of agreement, mutual

9   understanding, or meeting of the minds, to try to accomplish

10   a common and unlawful objective.

11         You may consider both direct and circumstantial

12   evidence in deciding whether the Government has proven beyond

13   a reasonable doubt that an agreement or mutual understanding

14   existed.   You may find the existence of a conspiracy based on

15   reasonable inferences drawn from the actions and statements

16   of the alleged members of the conspiracy, from the

17   circumstances surrounding the scheme, and from evidence of

18   related facts and circumstances which proved that the

19   activities or the participants in a crime venture and could

20   not have been carried out except as the result of a

21   preconceived agreement, scheme, or understanding.

22   If you find that a criminal agreement or conspiracy existed,

23   then in order to find the Defendant guilty of conspiracy, you

24   must also find that the Government proved beyond a reasonable

25   doubt that the Defendant knowingly and intentionally joined

1    that agreement or conspiracy during its existence.  The

2    Government must prove that the Defendant knew the goal or

3    objective of the agreement or conspiracy and voluntarily

4    joined it during its existence intending to achieve the

5    common goal or objective, to work together with the other

6    alleged conspirators toward that goal or objective.  The

7    Government need not prove that the Defendant knew everything

8    about the conspiracy, or that he knew everyone involved in

9    it, or that he was a member from the beginning.  The

10   Government also does not have to prove that the Defendant

11   played a major or substantial role in the conspiracy.

12   You may consider both direct and circumstantial evidence in

13   deciding whether the Defendant joins the conspiracy, knew of

14   its criminal objective, and intended to further the

15   objective; evidence which shows that the Defendant only knew

16   about the conspiracy or only kept bad company by associating

17   with members of the conspiracy; or was only present when it

18   was discussed or when a crime was committed.  It is not

19   sufficient to prove that the Defendant was a member of the

20   conspiracy, even if the Defendant approved of what was

21   happening or did not object to it.  Likewise, evidence

22   showing that the Defendant may have done something that

23   happened to help a conspiracy does not necessarily prove that

24   he joined the conspiracy.  You may, however, consider this

25   evidence with all the other evidence in deciding whether the

1   Government has proven beyond a reasonable doubt that the

2   Defendant joined the conspiracy.

3           In order to find the Defendant guilty of conspiracy,

4   you must find that the Government proved beyond a reasonable

5   doubt that the Defendant joined the conspiracy knowing of its

6   objective and intending to help further or achieve that

7   objective.  That is, the Government must prove one, that the

8   Defendant knew of the objective or goal of the conspiracy.

9   Two, that the Defendant joined the conspiracy intending to

10  help further achieve that goal or objective.  And three, that

11  the Defendant and at least one other alleged conspirator

12  shared a unity of purpose toward that objective or goal.

13  You may consider both direct evidence and circumstantial

14  evidence, including the Defendant's word or conduct, and

15  other facts and circumstances, in deciding whether the

16  Defendant had the required knowledge and intent.  For

17  example, evidence that the Defendant derived some benefit

18  from the conspiracy or had some stake in the achievement of

19  the conspiracy's objective might intend to show that the

20  Defendant had the required intent or purpose that the

21  conspiracy's objective be achieved.

22          Members of the jury, the Government is not required

23  to prove that any of the members of the conspiracy were

24  successful in achieving any or all of the objectives of the

25  conspiracy.  You may find the Defendant guilty of conspiracy

1    if you find that the Government proved beyond a reasonable

2    doubt the elements that I have explained, even if you find

3    the Government did not prove that any of the conspiracy --

4    conspirators actually committed the offense of advertising of

5    child pornography.  Conspiracy is a criminal offense separate

6    from the offense that was the object of the conspiracy.

7    Conspiracy is complete without commission of the offense.

8    Count two of the superseding indictment charges that the

9    conspiracy existed from in or about July 2016 through on or

10   about August 29, 2018.  The Government need not prove that

11   the conspiracy started or ended on or about those specific

12   dates.  It is sufficient if you find in fact that the charge

13   conspiracy was formed and existed for some time within the

14   period set forth in the superseding indictment.  The

15   conspiracy ends when the objectives of the conspiracy have

16   been achieved or when all members of the conspiracy have

17   withdrawn from it.  However, a conspiracy may be a continuing

18   conspiracy and, if it is, it lasts until there is some

19   affirmative showing that it has ended or that all its members

20   have withdrawn.  A conspiracy may be a continuing one if the

21   agreement includes an understanding that the conspiracy will

22   continue over time.  Also, a conspiracy may have a continuing

23   purpose or objective, and therefore may be a continuing

24   conspiracy.

25            Evidence has been admitted in this case that certain

1    persons who are alleged to be co-conspirators of the

2    Defendant did or said certain things.  The acts or statements

3    of any member of a conspiracy are treated as acts or

4    statements of all the members of the conspiracy even if these

5    acts or statements were performed or spoken during the

6    existence of the conspiracy and to further the objective of

7    the conspiracy.  Therefore, you may consider as evidence

8    against the Defendant any acts done or statements made by any

9    members of the conspiracy during the existence of and to

10   further the objectives of the conspiracy.  You may consider

11   these facts and statements, even if they were done and made

12   in the Defendant's absence and without his knowledge.  As

13   with all the evidence presented in this case, it is for you

14   to decide whether you believe this evidence, and how much

15   weight to give it.  Acts done or statements made by an

16   alleged co-conspirator before the Defendant joined the

17   allowed -- the alleged conspiracy, may also be considered by

18   you as evidence against the Defendant.  However, acts done or

19   statements made before the alleged conspiracy began or after

20   it ended may only be considered by you as evidence against

21   the person who performed that act or made that statement.

22   Members of the jury, upon the conclusion of my instructions,

23   you will retire to consider your verdict.  Your verdict on

24   each count must be unanimous.  That is, all jurors must

25   agree.  In reaching your verdict, you must determine the

1    facts from all the testimony you have received and from all

2    the other evidence which has been received during the trial.

3    You are the sole and exclusive judges of the facts.   Neither

4    I nor anyone else may infringe upon your responsibility in

5    that area.   You must, however, accept the Rules of Law as I

6    have given them to you whether you agree with them or not,

7    and then apply the law as I have stated it to the facts that

8    you find.

9          Your attitude and conduct at the outset of your

10    deliberations are matters of considerable importance.   When

11    you return to the jury room, your deliberations should begin

12    and proceed in an orderly fashion.   Your first order of

13    business is to elect a foreperson.   Now, you may choose any

14    one of your number as the foreperson, but I want to emphasize

15    that that person's vote, views, and opinions, are entitled to

16    no greater weight than any other juror.   The same is true of

17    notetaking.   Perhaps some of you have taken notes and others

18    have not.   Merely because a juror has taken notes does not

19    mean that those notes are accurate or that the person taking

20    the notes has a superior recollection of the evidence.   Notes

21    are not entitled to any greater weight than an individual

22    juror's recollection, and the recollection of the juror who

23    was taking notes is not entitled to any greater weight simply

24    because he or she took notes than is the recollection of a

25    juror whose memory is not supported by notes.

1    If, in the course of your deliberations you have any further
2    questions or should find yourself in serious doubt concerning
3    some portions of my instructions to you about the law, I'm
4    not suggesting that you will, but if you do, it is your
5    privilege to return to the courtroom for further
6    clarification.  In that event, you should first transmit,
7    through Deputy Clerk, Ms. Kristin Makely, a note to me signed
8    by your foreperson.  None of you should attempt to
9    communicate with me by any other means than a note signed by
10   the foreperson.  I will not communicate with you on any
11   subject touching the merits of the case other than in writing
12   or orally here in open court.  Any writing from me to you or
13   from you to me will be shared with Counsel.  At no time
14   during your deliberations should you reveal, even to me, how
15   you may stand numerically on any question before you.  That
16   cannot happen until you have reached a unanimous verdict.
17   Your function, members of the jury, is to reach a fair
18   conclusion from the evidence and the applicable law.  It is
19   an extremely important function.  Your verdict should be
20   reached only after careful and thorough deliberation.  In the
21   course of that deliberation, you should talk to each other,
22   consult with each other, discuss the evidence, discuss the
23   reasonable inferences to be drawn from the evidence, and you
24   should do all of this in a sincere effort to arrive at a just
25   verdict.  It is your duty to consider the issues with a view

1   toward reaching an agreement on a verdict if you can do so

2   without violating your individual judgment and conscience.

3   Each of you must decide the case for yourself, examining the

4   issues and evidence with candor and frankness, and with

5   proper deference to each other and proper regard for the

6   opinions of each other.  Mature consideration requires that

7   you be willing to re-examine your own views and to change

8   your opinion if convinced that it lacks merit or validity.

9   While maintaining this flexibility, you are not required to

10   surrender your honest conviction as to the weight or

11   effective evidence solely because of another juror's opinion

12   or merely for the purpose of returning a unanimous verdict.

13   Keep in mind, and I know you will, that this is a most

14   serious offense.  The parties' Counsel and I rely upon you to

15   give full and conscientious deliberation and consideration to

16   the issues and evidence before you.  You should not be

17   influence by anything other than law and the evidence in this

18   case.  Each of the parties stands equal before The Court.

19   Each of them is entitled to the same fair and impartial

20   treatment at your hands.

21        The verdict sheet in this case is a paper setting

22   out the name of the Defendant, together with a line for

23   guilty and a line for not guilty on each count.  That is

24   where you will record your verdict, either guilty or not

25   guilty.  For your convenience, each of you will have a copy

1   of the verdict sheet.  Normally, however, only one verdict

2   sheet will be filled out.  That should be filled out and

3   signed by the foreperson.  As I have previously stated, your

4   verdict should be unanimous.

5           Members of the jury, I want to review now with the

6   verdict form.  It has two paragraphs.  One, count one of the

7   superseding indictment charges the Defendant, Sharif El-

8   Battouty, with engaging in a child exploitation enterprise

9   from in or about July 2016 through in or about August 2018.

10  We, the jury, unanimously find the Defendant, Sharif El-

11  Battouty, and then there's a place for you to check either

12  guilty or not guilty.  When you have concluded your

13  deliberations on count one, the verdict form then says

14  proceed to question two, which states count two of the

15  superseding indictment charges the Defendant, Sharif El-

16  Battouty, with conspiracy to advertise child pornography from

17  in or about July 2016 through in or about August 29, 2018.

18  We, the jury, unanimously find the Defendant, Sharif El-

19  Battouty, and then you will fill in guilty or not guilty.

20  Then there's a place for the signature of the foreperson and

21  the date.

22  My I see Counsel at sidebar?

23          (Sidebar discussion occurred at 12:38 p.m.)

24          THE COURT:  Jane?  Any objections to the charge for

25  the Defendant?

1          MR. LEE:  Yes.  Please note my objection to

2    paragraph 67, which relates to the proposed jury charge that

3    is submitted to the Court on the meeting of the in-concert

4    provision in count one.  Your Honor, with respect to the

5    paragraph --

6          THE COURT:  I will allow --

7          MR. LEE:  I'm sorry.

8          THE COURT:  -- that you have objected to the way you

9    calculate the number.

10          MR. LEE:  Correct.

11          THE COURT:  Yeah.  The objection's overruled.

12          MR. LEE:  Okay.  Your Honor, in para 18, which is

13   the reasonable doubt paragraph --

14          THE COURT:  Yeah.

15          MR. LEE:  You -- there was one word you mis --

16          THE COURT:  Okay.

17          MR. LEE:  -- spoke on.

18          THE COURT:  Okay.  Alright.  What did I say?

19          MR. LEE:  I can show you.  You said convinced --

20          THE COURT:  Alright.

21          MR. LEE:  -- instead of convicted.

22          THE COURT:  Let me reread that.

23          MR. LEE:  Could you reread the whole paragraph?

24          THE COURT:  I don't think it necessary.  I'll start

25   with reasonable doubt, it's not that (indiscernible).

1          MR. LEE:  Okay.

2          THE COURT:  Alright.  Any objections

3   (indiscernible).  Alright, I will make that correct and tell

4   the jury that they'll be getting a copy of the charge, unless

5   (indiscernible).

6          MR. LEE:  One other item, Your Honor.  The

7   Government has prepared the laptop computer --

8          THE COURT:  Yes.

9          MR. LEE:  -- to go back.  I've reviewed it, so I'm

10  comfortable with -- subject to objection, which you

11  understand.

12         THE COURT:  I understand.

13         MR. LEE:  I'm comfortable with the laptop in its

14  current form that's going to go back to the jury, but I

15  wonder if you could instruct the jury that they should only

16  look at -- and by the way, we've wiped off all the other

17  files on the computer, just the exhibits.  But I would

18  request that you instruct the jury that they are not to do

19  anything else on the laptop other than look at the exhibits,

20  and my primary concern is I wouldn't want them to access the

21  internet and do any kind of research.

22         THE COURT:  Alright.  Well, I'll certainly tell

23  them.

24         MR. LEE:  Okay, thank you.

25         (Sidebar discussion concluded at 12:41 p.m.)

1       THE COURT:  Members of the jury, you may be happy to

2   know that you will each be getting a copy of my instructions,

3   which I've read for the last hour, so you'll each have that,

4   and you'll also -- for your reference.  And you will also

5   have a copy of the verdict sheet, although only one verdict

6   sheet should be filled out.

7       Now, I read this charge for about an hour, and

8   Counsel has informed me that I misread a sentence, so I want

9   to correct that now.  But I'll read several sentences around

10  it.  Reasonable doubt is doubt which appeals to your reason,

11  to your judgment, to your common sense, and to your

12  experience.  It is not caprice or whim or speculation.  It is

13  not an excuse to avoid the performance of an unpleasant duty.

14  A Defendant may not be convicted based on suspicion or

15  conjecture, but only on evidence proving guilt beyond a

16  reasonable doubt.

17      Members of the jury, the case is now in your hands,

18  and your first obligation will be to elect the foreperson,

19  and any one of you can serve as the foreperson.  You will

20  also be receiving a laptop which contains all the exhibits in

21  the case.  You will have that for your reference.  Now,

22  obviously you are to use the laptop only to look at the

23  exhibits.  You're not to do any research on it, to use it for

24  any other purpose, and I think that's pretty obvious.  I'm

25  sure you would not do that.  And I'm sure your lunch is

1   there, if it hasn't already arrived.  The case is now in your

2   hands for deliberation.  But before we retire, is there a

3   security officer here?  Ms. Makely, will you please affirm

4   him?

5          MS. MAKELY:  Please raise your right hand.  Do you

6   swear or affirm that you will keep this jury in a quiet,

7   convenient place for their deliberations, and that you will

8   allow no one to speak to them or speak to them yourself

9   touching the issue before them unless it is to inquire if

10   they have agreed upon the verdict?  Do you solemnly swear?

11          SECURITY GUARD:  I do.

12          MS. MAKELY:  Thank you.

13          THE COURT:  Before we retire, the alternate jurors

14   will not be deliberating with the jury.  Ms. Makely has a

15   comfortable location for you, and you're free to talk about

16   anything in the world you want to talk about except the case.

17   Please do not discuss the case while you are together.  Thank

18   you very much.

19          MS. MAKELY:  All rise.

20                    (Jury out at 12:43 p.m.)

21          (Recess at 2:43 p.m., until 2:18 p.m.)

22          THE COURT:  May I see Counsel?  John, you need to

23   get the copies of the charge and (indiscernible).

24                    (Jury in at 2:18 p.m.)

25          MS. MAKELY:  Court is now in session.

1          THE COURT:  You may be seated.  Will the foreperson

2     please rise.  Has the jury reached a verdict?

3          FOREPERSON:  Yes.

4          THE COURT:  May I see the verdict sheet, please?

5     Ms. Makely, will you please take the verdict?

6          MS. MAKELY:  On Bill of Indictment Number 18-352,

7     Defendant 3, between the United States of America and Sharif

8     El-Battouty, as to count one, do you find the Defendant

9     guilty or not guilty?

10         FOREPERSON:  Guilty.

11         MS. MAKELY:  As to count two, do you find the

12     Defendant guilty or not guilty?

13         FOREPERSON:  Guilty.

14         THE COURT:  Thank you.  Anything further from

15     Counsel at this time?

16         MR. SCHLESSINGER:  Not from the Government, Your

17     Honor.

18         MR. LEE:  Nothing, Your Honor.

19         THE COURT:  Thank you.  Members of the jury, I want

20     to thank you very much for your service in this matter.  I

21     will meet you in the jury room to say goodbye.

22         MS. MAKELY:  All rise.

23              (Jury excused at 12:20 p.m.)

24         THE COURT:  We'll give Counsel a date for

25     sentencing, which will probably be sometime in September,

82

1   because we need to get the (indiscernible).  Alright, thank

2   you very much and good luck to everyone.  And Ms. Shoop, good

3   luck to you on July 5th.

4          MS. SHOOP:  Thank you, sir.

5          MR. LEE:  Thank you, Your Honor.

6                  (Court adjourned at 2:23 p.m.)

CERTIFICATE

I, Stephanie Garcia, court approved transcriber, certify that
the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter.

June 24, 2019